Good morning. Good morning, Counsel. I'm Jeff Briggs, on behalf of Captain Eves. Good morning, Your Honor. Danton Richardson, on behalf of the law class of JAZZ, also happy to be with one of you. Good morning, Counsel. Come forward. May it please the Court. JAVA JAZZ was the owner of a registered trademark for the name JAZZLAND, in connection with certain retail services that it provided, in connection with a chain of coffee shops that it had. This case, this appeal, presents a case of reverse confusion, where the rights of that registered trademark owner were totally ignored by a larger newcomer, the defendants in this case. Notwithstanding the fact the newcomer offered the exact same goods and services, and in many instances the exact same mark covered by the Federal registrations, the jury returned the verdict of non-infringement. The exact same mark, do you mean more than just the name? Was the style or typeface or anything else involved? The name JAZZLAND was used in many instances. In fact, we have some of the physical exhibits here from the record where you can see repeated uses of just the name JAZZLAND. When consumers would see the name JAZZLAND, that's what we're focused on, is JAZZLAND. Yes, there were instances where it's JAZZLAND Theme Park, JAZZLAND Theme Park, New Orleans, or JAZZLAND Coffee, or JAZZLAND, a gourmet coffee company. But still, when people look at the two, it always goes back to JAZZLAND. And that's the trademark, and that is what the registered trademark is, JAZZLAND, in connection with certain retail goods and services. And by any chance have you ever looked in the phone book in New Orleans to see if there are listings for anything called JAZZLAND other than the amusement park? Well, that's not in the record, Your Honor. There were, there was some evidence of other uses of JAZZLAND. We've got to say, you talk about New Orleans, JAZZLAND, somehow it doesn't jump out as a name that's so distinctive. Well, Your Honor, in connection with the type of goods we have here, retail services for coffee, coffee beans, food products, T-shirts, hats, things like that, it is distinctive. And it's a strong mark. And there were no other uses of it in that area until, you know, for those services until my client came along. And my client obtained a federal registration. The products, I assume those are all on the record. These are, yes, Your Honor. Are those products manufactured by your client? Let's look. This is a hat from the JAZZLAND theme park. This would be a hat from the JAZZLAND theme park. You can see it's just JAZZLAND. The shirt, this is from JAZZLAND theme park. JAZZLAND theme park. This hat is JAZZLAND coffee. Look at the similarities in the logo of this hat from JAZZLAND theme park. You know, the names were encountered in instances where you just have the name JAZZLAND. Again, when people think of Starbucks, they don't say Starbucks coffee. We talk about Starbucks. When you think about, you know, the theme park, it was referred to JAZZLAND. Nobody said JAZZLAND the theme park. JAZZLAND. So who is confused about what? Well, this, I think, presents a classic case of reverse confusion. We have, and really, this appeal presents a couple of important issues for this Court to resolve, and that is whether a Federal trademark registration is going to have meaning. When you have a small company where it's the first user and the first to register the mark, and a subsequent much larger company comes along and says, look, we're going to totally supplant you in the market and usurp your mark because we're bigger, we're stronger, we're going to offer more services than what you offer, and therefore, you know, we're just going to trample on your rights. But don't we have to find counsel that you would have essentially been entitled to summary judgment before trial on all of the factors under Sleecraft? Because I would be inclined to agree with you that you have a very strong mark, and obviously the marks are similar, they're almost identical, but the jury had to find also that there was actual confusion and similarity of marketing channels and so forth, and we have to find in the procedural posture of this case that no reasonable jury could have found what this one did. So that sounds a lot like the summary judgment standard. Why is there not at least a factual issue where a jury could have gone the other way? Well, I would disagree whether as to the standard, and we can come back to that, but even looking at it under that standard, here I think no reasonable juror can conclude, looking at all the factors and all the evidence, given the nature of the marks, the type of services we're talking about. Again, we've got to go back to the foundational issue of what is our registered mark. It's Jazzland. What does it cover? It covers, specifically quoting from the registration itself, I've got it here. It covers, I'm sorry, I don't have a specific quote. But retail services for such items as coffee, coffee beans, drinks, salads, prepared foods, items such as that. Those are the same exact retail services that were offered at the theme park. Now, the theme park offered more, certainly, but still, we're a subset of that. Hearing about hats. Yeah, hats, T-shirts, those are specifically listed in there. Key chains, other items are also specifically listed in the registration itself. All right. Anyway, going back to the question, though. So what we're talking about here, given this evidence, I think the only way the jury's verdict is explainable is the confusion that was caused by the admission of evidence of the Louisiana registration. That's getting to the evidence here, but I just want to, before we go there. Sure. You're saying that the similarity is so overpowering and so multifaceted that obviously there was confusion. If so facto, there was confusion. And that gets back to the way I framed my question, that there was confusion as a matter of law. Because the jury was instructed that it had to decide whether there was actual confusion or not, and we can infer from the verdict that they decided that there wasn't. So, and there was certainly evidence presented by the defendant that there wasn't actual confusion. Well, I disagree. I think Your Honor's indicating there had to be actual confusion. No, that is actual. The standard is likelihood of confusion. All right. I'm sorry. You're right. But the jury, my point is there was a factual dispute at trial as to likelihood of confusion. And evidently the jury found against your client on that. And what I hear you arguing and what I took from your brief was that the jury couldn't have found that, that given how strong the mark was and the similarity and the similarity of the products, that they had to find that there was a likelihood of confusion. Exactly. And the only way to explain it, going to the other issue, we can get to. But when you look at everything, there really were no disputes of fact. I mean, it's admitted that Jazzland, the theme park, sold the same goods and services that Jazzland, my client, sold. That's admitted in the record by Mr. Winn, Mr. I apologize, by Jazz, by the defendant's lead witness there who appeared at trial. He admitted that in the record. We went over it. I read specifically. And here I have in front of me, for vending and retail store services featuring ground and whole bean coffee, coffee drinks, tea drinks, fruit juices, muffins, pastries, cookies, prepackaged foods, soup, salad, bagels, T-shirt, aprons, mugs, and candy, namely chocolates and chocolate covered. So, you know, that's a broad range of goods that are featured in retail services, same as the park offered. There really were no disputes of fact. Mr. Wilberton's testimony of the confusion he encountered stands unchallenged. Now, they question, oh, he's not believable and challenge that, but there's no contrary evidence. And it's certainly reasonable that when he walks in with a Jazzland hat and a Jazzland logo shirt and starts talking about, we'd like to set up a coffee shop here or sell you coffee goods or other services that we're offering, that people will say, well, are you from the theme park? You know, there's that natural... Okay, but I guess I'm still, I just want to make sure I understand what we're doing here. You're saying the evidence of similarity, putting the confusion aside for a second, the evidence of similarity was so strong that the jury and the district court and this panel should presume conclusively that there was confusion. And thus the only explanation for the jury's verdict is the admission of the Louisiana registration. Not presume that there was confusion, but I believe that as a matter of law, there was on these set of facts, which again are largely undisputed, it's admitted what the marks were, how they were used, how they were presented to consumers. Mr. Wilberton's testimony about actual confusion stands unchallenged. So if you go through all the factors, those factors, we're not just talking, one, the similarity of marks. We're not just talking, two, the similarity of the goods. The goods are exact. The services are exact. You know, we're talking virtually every, literally all the factors weigh in favor of infringement. And I submit that as a matter of law, there was infringement here. And the only way to, in hindsight, perhaps we should have moved for summary judgment. But the case went to trial, and the verdict come back, shock of all shocks, no infringement. And I think to defense counsel's credit, he did a masterful job of focusing the case and focusing the jury on, in effect, direct infringement and direct infringement standards. And the theme, oh, this is a theme park. This is a coffee shop. Nobody's going into the theme park and paying $30 to go buy a cup of coffee thinking it's coming from Jazzland Coffee. Well, that's true, but that's a reverse infringement, I mean, excuse me, a direct infringement analysis. The question really is, the consumers who would be aware of Jazzland Theme Park and their substantial in number, given the $7 million plus that was spent on advertising by the theme park, national advertising, by the way, website advertising, advertising to travel agencies and other people all over the country, in fact, all over the world, that when they see Jazzland Coffee, they would naturally assume, I submit, that there would be some affiliation to those same goods and services that would typically be found at a theme park, in addition to the rides and the other items. So, again, I think we go back to, we end up at, what I think is the key issue here in this case. That is, the admission of the evidence of the Louisiana registration and what effect that had on this jury verdict. And I think that tainted the whole jury verdict here. First off, and I think it's important for this Court to reverse the ruling to establish that trademark rights can only be obtained based on use. Because otherwise, you're basically saying that it was okay for Mr. Winninger, in the years before the theme park ever became a reality, in the times when dealing with government agencies, trying to get HUD loans or others to back this project, and that limited promotional use of the name, that those could somehow create rights to a trademark when there's been no actual use in connection with goods or services, and especially not the goods and services that were eventually offered at the theme park itself. But is that the only reason why the Louisiana registration was relevant to the issues of trial? That is, having a legal right to use the mark. Wasn't that evidence also potentially relevant to the issue of defendants' intent in selecting the mark and demonstrating that this was not an effort to copy the jazz land name as used by the coffee shops in California? Well, I would disagree. And the reason for that is that simply as a matter of law, no trademark attorney could say that without some use of that trademark. No, no, no. Don't go there. I'm asking you a very specific question, not whether they had legal rights emanating from it. It's state of mind. But isn't the act of going in at some earlier date, 1989, 91, whatever it was, and seeking a registration for that name well before that name is being used by coffee shops in California, relevant to the question of defendants' intent? Because it pretty clearly demonstrates that defendants playing around with that name, whether they use it enough to get legal rights or not, before they could have heard anything about the name being used in California and Arizona. Well, what you're talking about there is the earlier parties. The defendants in this case were on notice before they ever adopted and used the mark of our rights. And, in fact, when they got an assignment from Mr. Winninger of those rights in that assignment, he did not warrant or guarantee that he had any rights. And, in fact, his testimony was that there was no use of the mark in connection with any goods and services previously. Knowing that, no company could rely on that. So, in other words, what you're talking about could be possible relevance, but that would be relevance only to Mr. Winninger's state of mind. I think we have to look at the state of mind and the activities and the intent of these defendants, who, at the time they signed on to this project, were immediately notified of my client's rights and federal registration. In fact, were aware of it because they ran their own trademark search and decided to go forward with that anyway, even though Mr. Winninger told them he could not warrant or guarantee that he had any rights. In that kind of context, I don't think it's relevant. But even if it was relevant and it was okay to let that evidence in, I think the Court should have given some limited instruction. Did you ask for one? Well, no. We objected to the mission of the evidence altogether. And I think that preserves the error. We said it's just simply not irrelevant. When the Court overruled that, I think it's then the Court's duty to give some limited instruction. But in fact, the reason a limited instruction wasn't given here is the fact the Court didn't really limit. Looking back at the record, as I did recently, it doesn't appear the Court limited the effect of that evidence. And certainly the defendant was allowed, the defendants were allowed to argue that that created priority, not just go to state of mind. And it's that, I think, is really the key. The fact that they were able to argue, look, we have this registration, we have priority based on this earlier use. When as a matter of law, that use could not be, could not support any rights in these parties. And that's really what we have here, and that's why it's important for this Court to reverse this verdict. Was there any effort to obtain an instruction from the Court, maybe other than a limiting instruction, that addressed that issue? That is the, the, or were there instructions given by the Court with regard to the validity of the Louisiana registration and any rights that may have emanated from it? No. Again, we tried. Because if you tell me that you didn't, you objected to its admission, but there may have been another reason that permitted its admission, and you don't seek a limiting instruction or instructions with regard to that field of law, I'm not sure what error there is in front of us to consider at this point. Well, again, I think if you go back to considering the evidence, that even that evidence, which this Court would review de novo, because it's a legal issue, that this Court can determine that even if that evidence comes in and was proper, it's still, as a matter of law, not sufficient to create any rights in the predecessors to these defendants, and therefore they had no prior rights to my client. Well, but I'm having a hard time understanding how that got litigated before the District Court. You objected to the admission of the registration. Right. But there's, is there any, I didn't see it in the issues presented on appeal, that they were permitted to argue priority, which is a different kettle of fish altogether, what was done to preserve that issue? And in the context of that argument, couldn't the District Court, and shouldn't the District Court had it been raised and formulated a limitation? But I didn't see that in the record. Well, Your Honor, we submitted a brief. We not only made objections, but we submitted a brief, and that's at the volume two of the excerpts of record at page 350. It was our written brief as to why the evidence should not, evidence or argument should not be allowed. As to the registration, it could create no priority. So we instructed the Court of our position on that. Now, it would have been better to come back and say, look, we need some specific instructions, certainly. But in the way this case was litigated and the way the Court handled those issues, wanting to hurry up and bring the jury back and really cutting off the argument and things, and really wanting to just let the jury hear everything, you know, in the scheme of things, it looks like that didn't happen. There's no objection saying counsel can, given the Court's instruction or given the Court's decision to admit the evidence to which we continue to object, we nonetheless object to counsel arguing priority because he clearly didn't have it. That's not there. Well, it is in our brief that we presented to the Court in connection with our objections to the exhibits of the registration. And we asked the Court to keep that evidence out. Okay. And to keep that argument out. And it is there. And, again, it's at volume two, page 350 of the record. I would like to reserve for the little time I have for rebuttal. Thank you. Good morning, Your Honors. I'm Jeff Briggs, Officer LaGrossman, Stein and Kahn, on behalf of the defendants and appellees. Let me go right to that last issue that we were talking about on the Louisiana registration. I think a couple of points that need to be added. First of all, there was clearly no such request for a limiting instruction during the course of the trial. The brief that he's referring to was pretrial. The judge decided, I'll see what will happen at trial. The evidence, in fact, as we point out in our brief, came in through the plaintiff itself. Interestingly, I'm pretty sure I'm right on this. The actual registration, the Louisiana State registration, was not ever made a part of the record. What came into evidence on the plaintiff's affirmative case, the plaintiff testified that he had done a trademark search. He had had his lawyers do a trademark search for the word jazzland. And he got a report. And that the report, he did that in order to make sure that he could go ahead and use this name. Nobody else was out there using it. He testified to that. All we did was then the report, which was on the joint exhibit list with no objection, we showed the report to the witness on cross-examination, asked them to go to the page where it shows the state Louisiana registration in the name of our predecessors, and that's how the evidence came in. It was not a, you know, once the court decided, I'll wait and see what happens, in fact, the plaintiff put that evidence in. We then have the right to continue to use that evidence. We did not make a big issue of priority. I think that was a part of the instructions, though. There was an issue about when you use a trademark and how much use in close proximity to time, et cetera. And certainly one of the things that the jury could and I think did consider is that we had no bad intent. We thought we had a mark. We believed we had a legitimate mark going in. And that certainly was another reason that that was relevant. It also became relevant because of, again, the plaintiff's own having proper that evidence to begin with, that he did a trademark search. If he knew about the existence of a state trademark by somebody else in Louisiana for an amusement park, it was certainly conceivable that a jury could conclude if he wasn't worried about that when he went ahead and used Jazzland for a coffee shop, then he can't later complain that when the amusement park is there that there is going to be confusion. He did the search to avoid confusion. He went ahead with full knowledge that somebody had a state registration. Whether it was legitimate or not was not the issue. They had one. They were thinking about using it. So I think that that really answers that question. And in part goes to the other questions that the panel had, and I think, Your Honor, focused on it quite rightly, Judge Fogel, that here, you know, unlike some of the other cases we've heard this morning, which has been a real fun for an intellectual property attorney this morning, this is your day for trademark cases. But unlike those cases, we're not dealing with summary judgment here. This is a case, as the Ninth Circuit has noted, that frequently it's very difficult to grant summary judgment when you're talking about likelihood of confusion and the factors that go into determining likelihood of confusion. Those are very fact-intensive. There are a lot of things a jury can consider. Here, it went to a jury. A jury got a chance to consider those things. The plaintiff got its wish. There was no summary judgment. They certainly didn't make one. We didn't either. It went to a jury, and the jury, you know, he was characterized as being a shock. The district court certainly didn't think it was any kind of a shock. There were a number of facts. You asked the question of what facts were there that could support this jury's verdict. There are a lot. Among other things, a jury could look at those marks. You saw some of them. Can look at them, look at the differences in the style in which the way they were used. The jury heard evidence about the way in which the marks were actually used in context. For example, overwhelmingly, the marks used were Jazland Coffee or Jazland, a gourmet coffee company, and Jazland Theme Park, New Orleans. Overwhelmingly, that was the nature of the use. Furthermore, a jury knew that the marks were not used very much at all by either of the parties on the actual products themselves. They were used as signage, but there's testimony that most of the food products that were delivered to customers of the coffee shops came in containers that were either plain or were marked by the supplier itself. You went in there and bought a sandwich. It didn't say Jazland Sandwich. It said Joe's Deli Sandwich. Same thing at the amusement park. The record shows that other than at the very opening of the park, Jazland sold its beverage products not marked as Jazland Coke or Jazland Cola or anything else, but in a Coca-Cola glass, or they showed coffee in a plain white paper wrapper. There was even testimony from the president of Jazland that there was a specific reason for that, because prior to the park's opening, there had been an accident in which a truck had crashed or had an accident and spilled its contents all over the highway, and it made the news and everything. The contents were a whole bunch of Jazland materials, napkins and plates and stuff like that, destined for the opening. It decided it did not want to be involved in having its litter with its name all over anything, and it stopped marking all of its material that way. So there was plenty of evidence from which the jury could have concluded, looking at the marks themselves, that they weren't that strong, they weren't that similar, and they couldn't have been confused, because people didn't even go in and get a Jazland coffee cup of coffee from either location. They just got a plain cup of coffee. Also, there was evidence that consumers had to pay as much as five bucks a cup of coffee. I'm always mystified by the number of my friends, and I've never bought stock in Starbucks, because I've got to believe that someday someone is going to realize, you know, it really isn't that much better than this free stuff I get at home. But these are people who are spending a lot of money on coffee, five bucks a day for some of these things. People who are going into Jazland Amusement Park were paying on the order of 30 bucks or something to get into the park, and were going there for the coffee. They were paying a lot of money. They were exercising considerable care. Certainly, the jury could have reached that conclusion. A reasonable jury could have seen that as a factor weighing in its favor. These were not impulse buys. There was no evidence, really, of any actual confusion, and the jury certainly could have discounted entirely Mr. Wolverton's testimony about his few encounters with people down in New Orleans on a secondhand basis that he said they said certain things. First of all, even if you believe what he said, he was quickly able to explain there was a difference, and people were then willing to do business with him. It was no big deal at all. But you also have to, the jury could simply have discredited that testimony altogether. In the reply brief, counsel takes defendants to task for not having introduced evidence of the people that Mr. Wolverton talked to in order to dispute his claims. Well, he's got it the other way around. The plaintiff didn't bring in any evidence from those people he claimed to talk to. He could have done that. They claimed, well, they had declarations. Well, they tried to get the declarations in pretrial, and the court said, I can't have declarations from people. Take their depositions or do something. That never happened. There was no subpoena power. They didn't bring in those people. They could have. The jury could certainly have inferred from that that Mr. Wolverton was making all that stuff up. Marketing channels were very different. There's no evidence in the record that there was national, nationwide, or worldwide advertising of Jazzline other than the fact it did have a website. But we all know that having a website and being available to the world does not mean, for example, you're doing business in all of those parts of the world. So that can't, the marketing channels were vastly different. The evidence in the record that the jury could rely on was that basically you had a campus coffee shop with some flyers in the local areas where it worked versus Jazzline's radio and TV ads, not for coffee, not for hats, not for T-shirts, but for an amusement park. Nobody was going to confuse those, and clearly a jury could have concluded that. I've already addressed the intent issue with respect to showing that the Louisiana registration gave them a reasonable, good faith basis, at least a jury could certainly have concluded that they had a reasonable basis to believe they had rights to use the mark in an amusement park, and reason to believe that reasonable people who went to the amusement park and bought coffee there would not think there was some association with a coffee shop in Northern California. All of those facts were enough, and particularly given what I think is really the standard of review here, and we haven't, there were no questions from the court about that, but I think it's a pretty interesting issue, and I would like to address it briefly. I believe that the standard here is not whether there was substantial evidence to support the verdict, but whether there was any evidence at all to support it, and the reason for that is that I don't believe that there was a waiver by the defendants of its argument that the 50B motion that the plaintiff made after the jury returned its verdict was unsupported by a 50A motion. First of all, there's no dispute there was no Rule 50A motion. That's undisputed, made by the plaintiffs. They did not make that motion. They claim that, first of all, it would have been futile to do so based upon the extensive argument that the court had with counsel for defendant, me, when we made our 50A motion at the close of the plaintiff's case, and indeed at the close of all the evidence. The Rule 50A motion has a very distinct purpose. It is to put the party opposing that motion, against whom that motion is asserted, on notice of any potential deficiency in its evidence or something that could lead to a conclusion as a matter of law against it. And whether the court does that sua sponte, or whether it does it in reaction to a motion by the other side, there has to be very specific grounds for the motion. Then the purpose is to give notice to the other party so that the other party then has an opportunity to cure. That's what 50A is all about. That didn't happen here. Saying it's futile still didn't give us notice of any potential deficiency. Well, I guess as I read the record, you didn't have a chance to object, because Judge Mass denied the 50B motion before you had a chance to say anything. But I guess the question just going forward is whether you should have attempted to make a record anyway. I think that is exactly the question. It's very clear from the record that what happened, like I said, no 50A motion. So now the situation arises, he makes a 50B motion, which is done orally, not in writing, after the jury's returned a verdict, and before I can say a word, the judge denies that motion. Now, is that a waiver if I don't then have the sense, which maybe I should have, to say, oh, by the way, Your Honor, in addition to what you just said in denying the motion, I also want you to deny it because there was never a 50A motion underlying it. I didn't do anything to affirmatively waive that. And I think if you look at the waiver cases, it's not clear why those cases rule waiver. There's no real policy reason stated for it in the Graves case. The Graves case follows a bunch of cases from a bunch of other circuits. But if you look at those cases, you'll see that for the most part, although in some it's unclear, but for the most part it's clear that it was a motion, as a typical 50B motion is filed on paper 10 days after the verdict comes in, combined with a new trial motion, giving the other side an opportunity to really respond and to respond to the substance of the motion or to also respond on the 50A grounds. Typically, you would do both just to cover yourself. That didn't happen here. Now, does it make a difference? I think it does. And the reason I think it does, I think the policy that supports the waiver in the situation where the motion is made, full notice is given, and the other side is given an opportunity to respond to it, is that it is that, in essence, if I file a response or even if I had orally responded to the motion and said why that motion was deficient on the record, in essence, I'm telling the Court, even if I had notice of this at 50A time, after the close of evidence and before I went to the jury, I didn't have anything more to say. I wouldn't have had anything else to give you. But that's not what happened here. I think that's a good policy reason for waiver. It shows that I made an affirmative decision. You know what? Even if you had given me that chance, given me notice of the basis for your 50A motion, there's not much I could have done. I didn't have any other evidence. I've also just let the Court go through this whole long thing of ruling on these facts without bringing that little procedural thing to its attention. That's a waiver. In my situation, in this case, there was no opportunity at all, and one of the first things I ever learned was when you win, you shut up and you leave. Now, you might ask me why I'm not doing that now, but I haven't got there yet. But I sure as heck wouldn't want to have a rule that says if the district court doesn't even look at you and ask for a response, if the district court just immediately denies that oral motion at 50B time, when he denies that and gives you no chance at all to respond, it shouldn't be incumbent on me to just make that one little record. I think I'd have had the opportunity if it had been on full notice. That would have been fine. But I didn't make an affirmative waiver. In the other cases, in the cases that Graves Court relies on, there really was full-blown argument on that. It's an interesting point, though, because the effect of going your way on this is draconian with respect to the appeal. So it's a question. It happens all the time. And I learned this lesson, the lesson of how to make a 50A motion and the fact that you need to in a case that was decided in the Ninth Circuit some years ago where I had not tried the case but took the case on appeal and learned then it is a draconian rule, but, you know, it has a purpose. And the purpose is that if you're going to test the sufficiency of the evidence after going through years of free trial and everything else, you ought to give the guy a shot at knowing that that's going to happen and let him maybe have a chance to cure it by bringing in some other piece of evidence. So I think the more draconian rule would be to just allow everything to be substantial evidence. The rule is what it is. It's a pretty clear requirement. It requires that 50A notice. It requires specific reasons for it. And it requires you to give the party a chance to respond. We didn't have that here, and we didn't have an affirmative waiver of it on 50B because we were simply given no opportunity, and I wasn't about to start putting anything else in that judge's mind when I just had a jury come back. I also don't think in this case it makes any difference because you have a jury that considered all of the evidence. There was no limitations on that evidence. The evidence came in. They got to consider all of the sleep craft factors. They looked at the marks in the full context. They saw it all. And they simply weren't convinced that the plaintiff had met its burden of proof on enough of those sleep craft factors. And, you know, all they had to do was conclude on any one factor, and that could be enough because this is not summary judgment. This is a jury. Those sleep craft factors, sleep craft factors are not exclusive. No one is weighed any more importantly than other. Any one factor could be enough. This jury, unlike the summary judgment cases, this jury said, looking at all of them, there's no confusion here. We don't see the problem. And so that's the way I feel about it. Thank you, counsel. Thank you, Your Honor. If I may quickly, first on the procedural issue, I think the key factor is that a motion under 50B was heard and considered by the Court, and therefore it is now right for this Court to review that. And I do believe the standard would be de novo sufficiency of the evidence. So I don't think the issue really goes to waiver. But because I think the compelling factor is that you don't want the appellate court dealing with sufficiency of the evidence issues that haven't been considered by the district court. Here we did have the district court consider it, both in the context of the Defendant's 50A motion, during which it was very – and that was done, by the way, at the close of all the evidence, and where the Court made very clear that it believed there were factual issues that needed to go to the jury. Therefore, it would have been a moot or a fruitless act for us to say, oh, but we didn't believe them. How about us? You know, given the Court's demeanor and the way he dealt with those issues that were presented in the context of theirs, it didn't make any sense that as soon as they stood up and rested after the Court's ruling for us to then say, let us bring one, too. So, again, I think the Court is sufficiency of the evidence. I think here it's important to note that it's the Defendant that brought this up. And specifically in the opening argument at page 116 of the transcript, it's the Defendant that first argued about the Louisiana registration. We immediately after that, outside the President's jury, objected to that, presented to the Court a brief on the issue, that that evidence and argument should be kept out. The Court overruled that. Should we have stood up and jumped up every time that came up in the evidence? Perhaps so. But we preserved the issue by doing that. The Defendant contended that this was important because it showed they believed they had a mark. Well, if you look at the record, they filed, the Defendants filed an intent-to-use application for the Jazzland mark as late as 1998. If they already believed they had the mark, you wouldn't be filing intent-to-use applications. You would list the specific use of that. That evidence in the record clearly rebutts that point. I just want to point out, too, that their claim that there's differences here is like, you know, if I opened a Disneyland coffee shop, I'm sure Disneyland would be pretty upset about that. Or if someone had an earlier mark for Best Buy appliances, and then suddenly the Best Buy chain came into creation, it doesn't matter that they may offer all these other goods and items that are different from Best Buy appliances. The fact is they're going to supplant and usurp that first user's marks. And that's, in effect, what we have here. The Court should reverse this verdict to preserve the rights of a trademark owner in a Federal mark and show that reverse confusion is still alive and well in this circuit. Thank you. Thank you, counsel. The case just argued will be submitted. The Court will adjourn. All right. This court's discussion is adjourned.
judges: Reinhardt, Clifton, Fogel